[Cite as *State v. Hall*, 2019-Ohio-2985.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-170699 |
| | | C-170700 |
| Plaintiff-Appellee, | : | TRIAL NO. B-1607043 |
| vs. | : | |
| | | *O P I N I O N.* |
| RANDY HALL, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal: July 24, 2019


*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Sean Donovan,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller,* Hamilton County Public Defender, and *Krista Gieske,* Assistant Public Defender, for Defendant-Appellant.

**BERGERON, Judge.**

{¶1}   The state secured these criminal convictions by the thinnest of margins—indeed, of the 12 counts of the indictment that proceeded to trial, the trial court granted a Crim.R. 29 acquittal on five counts, the jury returned a defense verdict on two, and the state now concedes that the evidence does not support an additional count.  The trial also hinged on a credibility battle between the defendant and his accusers.  In light of that backdrop, we find that two interrelated errors deprived the defendant of a fair trial.  First, the state belatedly sprung an expert witness on the defense at trial without providing an expert report as mandated by Crim.R. 16(K).  And second, the prosecutor engaged in pervasive misconduct during closing argument, demonizing the defendant as a "wolf" and "predator," and repeatedly vouching for the credibility of the accusers.  Based on these errors, we reverse the convictions and remand for a new trial on the remaining four counts.

I.

{¶2}   In the summer of 2016, Randy Hall was living with his girlfriend, Meleaka Porter, in an apartment on Harrison Avenue.  Crammed into the apartment with the couple were Ms. Porter's six children, her mother, and Mr. Hall's biological daughter, H.H.  A few doors down lived neighbor Chorquance Brown with her children, including daughter J.C.  The two families had amicable relations, with Ms. Brown's daughter J.C. spending a fair amount of time with Ms. Porter's daughter, T.R.  Mr. Hall would frequent the Brown residence, play basketball with Ms. Brown's older sons, and referred to Ms. Brown as "Mom."

{¶3}   Things took a darker turn, however, when in August 2016 Ms. Brown's daughter, J.C., came forward with allegations of sexual abuse by Mr. Hall.  Detective Jane Noel, a veteran detective, led the investigation into these allegations. In the midst of the

2

investigation process, other reports of abuse surfaced from both Ms. Porter's daughter, T.R., and Mr. Hall's daughter, H.H. These allegations culminated in an indictment of Mr. Hall on 12 counts of either rape or gross sexual imposition ("GSI") regarding J.C., T.R., and H.H.

{¶4} Due to the absence of physical evidence, the trial focused upon testimony by the victims and persons involved with the investigation. All three victims, J.C., T.R., and H.H. testified. Also called to testify was Detective Noel regarding her investigation and experience with child-sexual-abuse investigations. Additionally, Dr. Kathy Makaroff, a child-abuse pediatrician who works with the Mayerson Center for Safe and Healthy Children evaluating children suspected of physical or sexual abuse, testified as an expert medical witness for the state.

{¶5} Mr. Hall took the stand in his own defense, where he theorized that T.R. and H.H. were engaged in a conspiracy instigated by another of Ms. Porter's daughters, who had recanted her accusations against Mr. Hall before trial. To explain J.C.'s accusations, he posited that she was retaliating after he had told her to stay away from H.H. because of an altercation between the two girls.

{¶6} At the close of the state's evidence and pursuant to Crim.R. 29(A), the defense moved for acquittal based on insufficient evidence as to counts six, seven, eight, and nine of the indictment (counts relating to rape of T.R.), which the trial court granted. Additionally, the court, upon its own motion, acquitted Mr. Hall on count ten of the indictment (related to rape of H.H.). The case ultimately went to the jury and, after deliberation, the jury returned a verdict finding Mr. Hall guilty of counts one, two, and three for rape of J.C. and count four for GSI of J.C. The jury also found him guilty of count 12 for GSI of H.H. Finally, the jury found him not guilty of the two remaining counts of rape, counts five and 11 of the

indictment (both pertaining to rape of T.R. and H.H.). Mr. Hall was ultimately sentenced to ten years to life on each of the rape charges and five years for each of the two GSI counts.

{¶7} Mr. Hall now appeals from his convictions, asserting four assignments of error. On appeal he challenges the sufficiency and weight of the evidence supporting his convictions, the application of Ohio's rape-shield statute to the exclusion of evidence in this case, the admission of Detective Noel's testimony despite the lack of an expert witness report pursuant to Crim.R. 16(K), and finally, prosecutorial misconduct based on statements made by the state during closing arguments.

II.

A.

{¶8} We begin with count 12 of the indictment, and Mr. Hall's first assignment of error. Given our disposition below, we only address this assignment of error insofar as it relates to Mr. Hall's conviction for count 12, GSI of H.H., and whether sufficient evidence supported it. R.C. 2907.05(A)(4) requires that "[n]o person shall have sexual contact with another, not the spouse of the offender, cause another, not the spouse of the offender, to have sexual contact with the offender * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." Sexual contact is defined as "any touching of any erogenous zones of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). The jury was instructed at trial that in order to find Mr. Hall guilty on count 12 they must "find beyond a reasonable doubt that * * * [Mr. Hall] caused [H.H.] to have sexual contact with him * * *." The state acknowledges that, during trial, H.H. testified that Mr. Hall touched her vagina and digitally penetrated her, but she did not testify that he caused her to have sexual contact

with him. Thus, the state concedes in its appellate brief that "[Mr.Hall's] conviction for Count 12 was not supported by sufficient evidence and should be dismissed." We accept the state's concession, and accordingly sustain Mr. Hall's first assignment of error with respect to count 12 and reverse his conviction on that count.

B.

{¶9}  With count 12 resolved, we turn our focus to the third assignment of error, relating to the admission of expert testimony by Detective Noel, which we ultimately find dispositive. The trial court admitted Detective Noel's testimony at trial as an "expert in investigating child abuse and neglect," and she offered several opinions in this vein. We note that while the standard for reviewing the trial court's admission of expert testimony is for abuse of discretion, an error of law can constitute an abuse of discretion. *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 9; *see State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 24-25 (2d Dist.) (explaining that trial court could in fact abuse its discretion by committing an error of law). Defense counsel duly objected to Detective Noel's testimony, arguing that the state furnished no Crim.R. 16(K) report.

{¶10}  Crim.R. 16(K) requires that an expert witness must prepare a "written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications." That report must be turned over to the other side "no later than twenty-one days prior to trial" in the absence of good cause shown that does not prejudice the other side.  Crim.R. 16(K).  The rule also contains a simple remedy for a violation: "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." *Id.*

{¶11} This rule is one of fairly recent vintage, promulgated in 2010. The purpose of the rule is straightforward, as reflected in its plain language and echoed by the Staff Notes: "Failure to comply with the rule precludes the expert witness from testifying during trial. This prevents either party from avoiding pretrial disclosure of the substance of expert witness's testimony by not requesting a written report from the expert, or not seeking introduction of a report."[1] Our sister districts have explained that the purpose of Crim.R. 16(K) is to avoid "trial-by-ambush" scenarios. *See State v. Walls,* 2018-Ohio-329, 104 N.E.3d 280, ¶ 39 (6th Dist.) (error to allow doctor's expert testimony when testimony exceeded scope of report). Supplying a Crim.R. 16(K) report alleviates "unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report." *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶ 36, quoting *State v. Perry*, 11th Dist. Lake No. 2011-L-125, 2012-Ohio-4888, ¶ 55 (no prejudice to defendant when medical records had been supplied, thwarting any undue surprise from medical expert's testimony). Providing the report in advance of trial affords the opposing party an opportunity to secure its own expert in response, but even if it elects not to do that, it may well consult with an expert on how to best cross-examine the other side's expert. *See Fetty* at ¶ 37 ("The policy behind these rules is to avoid ambush and thwarting of opposing counsel's ability to effectively cross-examine the expert.").

---

[1] A survey of Ohio appellate caselaw reveals that despite the 2010 changes to Crim.R. 16, some courts continue to import the pre-2010 amendment test in evaluating reversal based violations of the rule. *E.g., State v. Palmer,* 12th Dist. Butler Nos. CA2013-12-243 and CA2014-01-014, 2014-Ohio-5491, ¶ 39, quoting *State v. Joseph*, 73 Ohio St.3d 450, 458, 653 N.E.2d 285 (1995) (reversal for a violation of Crim.R. 16(K) requires "(1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefitted the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect."). Application of this test, however, disregards the 2010 changes to the rule, which adds the requirement of the Crim.R. 16(K) report and dictates that a "[f]ailure to disclose the written report * * * shall preclude the expert's testimony at trial."

{¶12} No one disputes that the state failed to provide a Crim.R. 16(K)-compliant expert report. The state points out, however, that it did tender an investigatory report that documented Detective Noel's investigation, but it faces two problems here. First, the investigatory report (as best we can tell) never found its way into the record, which precludes the state from seeking refuge in it now. Second, and more fundamentally, a world of difference exists between an *investigatory* report ("I observed this during my investigation") and an *expert* report ("I'm qualified as an expert and here are my opinions").[2] To its credit, the state does not pretend that the investigatory report actually reveals any expert opinions. As a result, even if it were contained within the record, it would not satisfy the basic requirements of the rule.

{¶13} At trial, the state qualified Detective Noel as an expert, and the trial court recognized her as such and allowed her to offer a series of opinions over objections. Given the absence of any expert report, Mr. Hall understandably emphasizes the rule's mandatory "shall" language and the simple remedy contained within the rule. Crim.R. 16(K). Reviewing the admission of Detective Noel's testimony under this framework, we agree that it was error to allow her testimony.

{¶14} Once given the mantel of "expert," Detective Noel proceeded to explain how "normally" in sexual-assault cases against a child, "we have very limited physical evidence, mostly due to a delay in reporting[.]" She offered her opinion that "normally" these cases do not involve assault by a stranger but rather "it's a trusted member of the family, a loved one, a family friend who engages in this activity with the child." She reiterated this point a few

---

[2] Needless to say, not every investigating officer needs to be qualified as an expert, particularly if they offer testimony limited to the investigation. Once they stray beyond that and start venturing opinions, however, this can change the analysis, and here, the trial court required the state to qualify Detective Noel as an expert because she was doing exactly that.

times and explained that the "child loves this person potentially, and the person engages in this activity over a period of time."

{¶15} Detective Noel also offered an opinion that "typically" children victimized by sexual assault begin to convey information "bit by bit. They might disclose just a small portion of the incident and then, as the child begins to feel more comfortable about telling, they'll disclose more." That, according to her expert opinion, is "a typical reaction to most children." She further explained how children recall time, and that most children "are bad about judging even how old they were at the time the abuse started."

{¶16} The state also elicited, effectively, Detective Noel's perspective on this case by asking her "have you ever had a case that you do not feel was worthy of an investigation or going forward." Detective Noel agreed that she had: "Frequently, I've had cases that there wasn't enough corroborating evidence or there wasn't enough substantiating evidence coming from the other direction, and the case would not be prosecutable, so it is not presented to be indicted." Her investigations "take a rather lengthy amount of time," and "[m]aybe not half of them, but a good portion of them go for indictment." But this case met her standards for further pursuit, and after she wrapped up her investigation, Detective Noel "sent [it] over to the Hamilton County Prosecutor's office for consideration for indictment."

{¶17} Detective Noel's opinions overlaid with the factual situation before the jury. For example, Detective Noel rebuffed defense attempts to undermine her lack of investigative efforts (for instance, failing to search for evidence in either of the locations where the assaults allegedly occurred) by explaining that, as she had already opined, she would not expect to uncover any evidence pertinent to the investigation. Time and again, Detective Noel tied her opinions to the case at hand by showing how the children's delayed

reporting, the lack of physical or other evidence, and their close connection with Mr. Hall comported with "normal" child-sexual-assault cases.

{¶18} Detective Noel's testimony also helped shore up that of the state's medical expert (Dr. Makaroff), who testified that the results of J.C.'s medical examination were normal. Dr. Makaroff explained that normal findings from such an examination could still be consistent with allegations of sexual abuse, and the passage of time after a sexual assault factors into whether there are visible signs of the assault when the child is examined. Detective Noel essentially validated those points through her own testimony.

{¶19} Detective Noel was the state's final witness and helped the state wrap up its case. In closing argument, the state relied heavily on many of the points she articulated. The state sought to blunt any concerns about H.H. by acknowledging that "[s]he may not have the best recall of time," and of course Detective Noel testified about that precise subject. The state also brandished Detective Noel's "vast experience" and utilized her testimony to explain the lack of other corroborating evidence. After defense counsel hammered the lack of evidence and other perceived investigatory inadequacies in closing, the prosecutor came back in rebuttal, reminding the jury that "the experts came in and told you, there's typically not medical evidence in these cases * * * You had an expert come in and tell you about that and verify that." In short, Detective Noel's opinions proved central to the state's case.

{¶20} Detective Noel's opinions constitute expert opinions submitted without a report in contravention of the plain language of Crim.R. 16(K). The trial court committed error by allowing these opinions to reach the jury, and accordingly we must now evaluate whether this error was harmless. *See* Crim.R. 52(A) ("[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."); *Walls*, 2018-Ohio-

329, 104 N.E.3d 280, at ¶ 40 ("Having found that the trial court erred in allowing [the expert] testimony, we must determine whether that error is reversible."). The Ohio Supreme Court has clarified that Crim.R. 52(A) requires first a determination that the right affected by the error is "substantial" and then whether reversal is warranted because the accused was prejudiced. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 24. Evaluating prejudice requires examining "the error's impact on the verdict and the weight of the remaining evidence * * *." *Id.* at ¶ 25. From the relevant caselaw, three considerations emerge: 1) the defendant must suffer prejudice as a result of the admission of the improper evidence, 2) the appellate court must believe that the error was not harmless beyond a reasonable doubt, and 3) the court must excise the improper evidence and evaluate the evidence remaining to determine whether a new trial is required. *Id.* at ¶ 27-29.

{¶21} In determining whether Mr. Hall suffered prejudice by the admission of the testimony, we note that here the state intended Detective Noel's testimony "to carry great weight with the jury." *See Walls* at ¶ 45. The state presented her as an accomplished expert with 27 years of experience in child-abuse investigations, specialized training, and commendations when introducing her testimony to the jury, and the state emphasized her (and her opinions) throughout closing argument. *Id.* at ¶ 45 (introduction of doctor's credentials at trial emphasized the weight of his testimony with the jury). Moreover, her testimony assumed importance because it bolstered the victims' credibility by explaining the lack of physical evidence and delayed reporting in this case, as she chronicled why she would not expect to find physical evidence and why the victims delayed their reporting (all of which dovetailed with her opinions above as well as those of the medical expert).

10

{¶22}  Without Detective Noel's testimony, the jury might have considered the lack of physical evidence in relation to the victims' credibility in a different light.  *See State v. McGhee,* 11th Dist. Trumbull No. 2014-T-0106, 2017-Ohio-5773, ¶ 19 ("Dr. Melville's testimony regarding why female children often do not display physical signs of sexual activity or trauma was extremely important to the state's case.").  The same point holds true for the impact of the delayed reporting.  *Id.* at ¶ 20 ("Dr. Melville's testimony regarding delayed disclosure was vital to the state's case."); *Walls* at ¶ 38 (faulting the state for failing to provide a report on "delayed disclosure" when that expert testified to that at trial).  The introduction of this testimony was vital, as the state's entire case hinged on the credibility of the victims.  *See State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, 931 N.E.2d 143, ¶ 124 (7th Dist.) ("[I]t is well established that expert testimony that bolsters a victim's credibility is permissible."); *McGhee* at ¶ 20 (expert testimony "may have significantly buttressed [victim's] credibility, to McGhee's prejudice.").

{¶23}  We also note that the weight that expert testimony carries with the jury is fundamentally different than that of lay testimony (particularly when the expert is a police officer), and countering such testimony requires unique considerations, of which defense counsel was deprived in this instance. *See State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 39 ("[G]iven the weight the jury would likely have assigned to [the expert's] testimony, a reasonable juror would be inclined to view with suspicion [the defendant's] own testimony * * *."); *Walls* at ¶ 45, citing *State v. Holt,* 17 Ohio St.2d 81, 86, 246 N.E.2d 365 (1969) ("Because of the witness's educational background and his apparent prestige, his testimony undoubtedly made an impression on the jury and was accorded greater weight that it was entitled to."). Without access to the content of her opinions

beforehand, defense counsel was forced to respond on the fly. In sum, the defense was prejudiced by the denial of the opportunity to fully challenge Detective Noel's testimony.

{¶24} Furthermore, this error was not harmless beyond a reasonable doubt. Detective Noel's testimony bolstered the children's testimony by lending it credibility in a case without any physical evidence against the defendant, thus likely impacting the jury's verdict. *See Harris* at ¶ 39 (psychologist's opinion that defendant was feigning mental illness created a "reasonable possibility that * * * testimony had an impact on the verdict and was not harmless beyond a reasonable doubt."). Acquittal was granted on five counts of the indictment at the close of state's evidence precisely because of insufficient evidence, with the state conceding on appeal that Mr. Hall should be acquitted of count 12 for the same reason. In other words, this is not the prototypical case where evidence of guilt is strong, and we can have confidence that the error did not impact the outcome.

{¶25} Excising this testimony and reviewing the strength of the remaining evidence, the state's case depended on which witness was more credible, J.C. or Mr. Hall. Thus, admission of Detective Noel's expert testimony likely colored the jury's ability to properly weigh the credibility of the witness. *See id.* at ¶ 43 ("Because of [the expert's] improperly admitted testimony, the jury was unable to properly weigh credibility.").

{¶26} Both the Sixth and Eleventh Districts have recently reversed convictions in sexual-assault cases for allowing experts to testify beyond the bounds of their reports (*Walls* and *McGhee*). We find their reasoning persuasive, and note that, at least in those cases, the defense received an expert report of some fashion. No such report was tendered here, magnifying the extent of the error.

{¶27} We also note another distinction with *Walls* and *McGhee* that renders this case even more suited for reversal—pervasive prosecutorial misconduct during the closing

arguments. The Ohio Supreme Court has instructed us, in evaluating the harm, that "the actions of a prosecutor may combine with an evidentiary error to cause greater impact." *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, at ¶ 31. That certainly rings true here, and leads us to Mr. Hall's fourth assignment of error. In his fourth assignment of error, Mr. Hall advances a claim of prosecutorial misconduct based on comments during closing arguments.

{¶28} Initially, we note that no objections were raised below to the closing argument, which normally confines our review to plain error. *State v. Fudge*, 2018-Ohio-601, 105 N.E.3d 766, ¶ 49 (10th Dist.); Crim.R. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). Here, however, we consider not whether the fourth assignment of error stands on its own, but rather its impact on the third assignment of error.

{¶29} We accordingly turn to the closing argument. Reviewing a challenge of prosecutorial misconduct in closing argument requires evaluation of whether the comments were improper and prejudicial to the accused's substantial rights. *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 44. Prosecutorial misconduct determinations require that "on the record as a whole, the misconduct can be said to have deprived the appellant of a fair trial." *State v. Hunter*, 1st Dist. Hamilton Nos. C-140684, C-140704 and C-140717, 2016-Ohio-123, ¶ 34. On appeal, Mr. Hall draws our attention to the following discourse by the prosecutor during closing argument:

> This defendant, this **predator**, told you that he is the victim of a conspiracy of little girls. * * * Do not be fooled. [Mr. Hall] is a **wolf** and he is the **predator**. He raped [J.C.] by raping her with his penis. He raped her vaginally by penetrating her vagina with his penis. He did this at her house. *

* * He forced her to touch his penis with her hand. That's rape, gross sexual imposition.

* * *

**Predators** like his man, Randy Hall, pick their victims wisely so there isn't corroboration. He knows how to deal with these girls. He was nice to them, but also sort of threatening and controlling. He chose easy targets.

* * *

After reviewing the evidence and applying the law, justice demands that this defendant, this **predator**, be found guilty of these charges. Any verdict other than guilty would not be reasonable, it would defy common sense, and it would be contrary to your instructions.

{¶30} In evaluating these remarks, we are reminded that "[p]rosecutors serve a special role in our justice system requiring them to adhere to the highest standards and to avoid improper arguments, insinuations, and assertions calculated to mislead the jury." *State v. Freeman*, 138 Ohio App.3d 408, 419, 741 N.E.2d 566 (1st Dist.2000), quoting *State v. Fears,* 86 Ohio St.3d 329, 351, 715 N.E.2d 136 (1999) (Moyer, C.J., concurring in part and dissenting in part). Therefore, a "prosecutor should not invade the jury's realm by rendering a personal belief regarding guilt." *State v. Simmons*, 2014-Ohio-3695, 19 N.E.3d 517, ¶ 77 (1st Dist.), citing *State v. Smith,* 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). While we acknowledge that prosecutors are afforded some latitude in closing, this leeway crosses the line when a prosecutor "deliberately saturate[s] trials with emotion." *State v. Keenan*, 66 Ohio St.3d 402, 409, 613 N.E.2d 203 (1993) ("[P]rosecutor's histrionic approach to this case crossed the line that separates permissible fervor from a denial of a fair trial" by expressing opinion about the guilt of the defendant). We have little hesitation in finding

these comments improper because they are in the same vein of comments that we have repeatedly deemed inappropriate.

{¶31} Over a decade ago, in *State v. Burrell*, 1st Dist. Hamilton No. C-030803, 2005-Ohio-34 , we faulted this prosecutor's office for calling a defendant a "psychopath" in closing argument, and emphasized that this was not an isolated misstep: "We agree that the prosecutor's comments went beyond zealous advocacy into the realm of the patently improper. **Yet again, we caution the state about using these tactics.**" (Emphasis added.) (Citations omitted.) *Id.* at ¶ 25. That message has apparently not resonated, as we faced essentially the same issue several years later in *Simmons*, where this court explained that continued reference to a defendant as an "offender" during closing arguments insinuated the prosecutor's belief regarding the defendant's guilt and was improper. *Simmons* at ¶ 77. (We did not grant relief in either *Burrell* or *Simmons* in light of the overwhelming evidence in those cases.). We fail to understand why prosecutors must resort to improper name-calling during closing argument rather than letting the strength of their evidence do the talking.

{¶32} Other courts in Ohio have shared our concern. The Ohio Supreme Court found references to the defendant as a "thug" and "hardnosed goon" improper in other circumstances. *State v. Liberatore,* 69 Ohio St.2d 583, 433 N.E.2d 561 (1982), fn. 9 (prosecutorial misconduct when prosecutor "characterized the defendant in derogatory terms clearly designed to inflame the jury."). Even use of the word "predator" once during closing argument constituted improper conduct according to the Fourth District. *State v. Canterbury,* 4th Dist. Athens No. 13CA34, 2015-Ohio-1926, ¶ 24 (comment improper but not prejudicial in the face of other evidence before the jury).

{¶33} There can be little question, reading the closing argument as a whole, that the prosecutor's deliberate, and repeated, invocation of these terms was designed to "inflame the jury," *see Liberatore* at 590, and to "deliberately saturate" the trial with emotion. *Keenan* at 409. Nevertheless, the state insists that the terms "wolf" and "predator" fell within permissible bounds under the circumstances. The state largely points to *Simmons*, endeavoring to distinguish "offender" (which has a legal connotation) with "predator" (which the state contends does not). This is misguided for two reasons. First, contrary to the state's argument, the term "predator" has certain legal connotations which denote the word to mean someone convicted of a sex-related crime and implicates guilt. For example, under Ohio's previous sexual-offender-classification framework, Megan's Law (former R.C. 2950.09), the highest level of a sexual-offender classification was "sexual predator." Additionally, this term has a similar colloquial connotation, as one need look no further than the title of the show "To Catch a Predator" to appreciate the point.

{¶34} Second, and more fundamentally, the state cannot demonize (and even dehumanize) a defendant with this type of name-calling in argument. As noted above, such language invites the jury to make its decision based on emotion rather than facts, and we see no purpose for such language in a courthouse erected to serve the ends of justice and the search for truth. Notably, the state fails to identify any case where an Ohio court has upheld the propriety of terms like "wolf" and "predator" during the course of closing argument.

{¶35} Considering the entire closing argument in context only reinforces our view. In addition to the prosecutor's comments labeling Mr. Hall a "predator" and a "wolf," the prosecutor engaged in improper vouching. Recall, without physical evidence at hand, this case involved a credibility battle between Mr. Hall and his accusers. In closing, the prosecutor vouched for the credibility of the accusers by assuring the jury that they lacked

the capacity to lie. Such statements thus implied that the prosecutor knew facts outside the record about the mental proclivities of these witnesses.

{¶36} Nor were these statements accidental, as the prosecutor drove the point home multiple times:

> And the [defense counsel] wants to talk about credibility. Who has the motive to lie in this case? This defendant right here, Randy Hall. Not these little girls. They don't have the capacity to continue on this year-long conspiracy against him. Give me a break.
>
> * * *
>
> You saw these girls. They do not have the capacity to carry on three independent accounts of sexual abuse by this defendant for over a year.
>
> * * *
>
> [The girls] came in here and did the best of their little girl brain ability to tell you what he did to them. They don't have the capacity to form a conspiracy against poor victim Randy Hall.

Prosecutors must not vouch for the credibility of witnesses. *State v. Williams*, 79 Ohio St.3d 1, 12, 679 N.E.2d 646 (1997) ("It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused."); *State v. Myers,* 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 145 ("It is improper for a prosecutor to vouch for the credibility of a witness at trial."); *State v. Wilson,* 1st Dist. Hamilton No. C-000670, 2002 WL 598226, *7 (April 19, 2002) ("[T]he prosecutor's act of personally vouching for the credibility of the state's witnesses was an invasion on the province of the jury * * * it was clearly improper and constituted misconduct.").

{¶37} Although Mr. Hall did not object to the closing, the misconduct "still form[s] part of the context in which we evaluate the effect on the jury of errors that were not waived." *See Keenan*, 66 Ohio St.3d at 410, 613 N.E.2d 203. This brings us back to Detective Noel's testimony.

{¶38} In closing, the prosecutor returned to Detective Noel's testimony, reminding the jury that: "Detective Noel told you about her vast experience and how she would not be able to get a viable crime scene or evidence * * * yet, [Mr. Hall's] going to ask you to just completely disregard that." The state also played up the significance of the expert testimony, and of course Detective Noel's opinions provided an important corroboration for those of the medical expert. Closing argument thus brings about the confluence of Detective Noel's expert testimony with the litany of problematic statements, all of which we must consider against a case without an overwhelming evidentiary foundation. *Id.* at 411. ("Without overwhelming evidence of guilt, we cannot know what the verdict might have been had not the prosecutor clouded the jury's vision with improper tactics.").

{¶39} When the jury's determination of guilt rests solely on the question of which testimony they believed, the victims' or Mr. Hall's, the prosecutor's conduct (denigrating the defendant, calling him a "wolf" and a "predator," vouching for the state's witnesses) compounded the problems inherent in admitting Detective Noel's testimony. And under the circumstances, we cannot say with any degree of confidence that the jury's determination here was based on the actual credibility of the witnesses rather than the errors at trial because the errors were so significant in terms of their impact on credibility. Thus, Mr. Hall was prejudiced by the admission of the expert testimony, it is not clear beyond a reasonable doubt that this error did not affect the outcome, and the strength of the remaining evidence was no doubt buttressed by Detective Noel's testimony. In sum, under these circumstances

the admission of Detective Noel's testimony constituted prejudicial, rather than harmless, error.

III.

{¶40}   For all of the foregoing reasons, we sustain Mr. Hall's first assignment of error only insofar as it relates to count 12, and he is therefore discharged on that count. We also sustain his third assignment of error and remand for a new trial on the four remaining counts (one through four).   Based on our disposition, we find that the remaining assignments of error are moot and we do not address them.[3]  *See* App.R. 12(A)(1)(c).

**Judgment reversed and cause remanded**.

CROUSE, J., concurs.
ZAYAS, P.J., concurs in judgment only.

Please note:

The court has recorded its own entry this date.

---

[3] We note that Mr. Hall's second assignment of error pertains to the effect of the rape-shield statute, which is an issue presently pending before the Ohio Supreme Court. *State v. Jeffries*, 2018-Ohio-162, 104 N.E.3d 900 (8th Dist.), *appeal accepted*, 152 Ohio St.3d 1477, 2018-Ohio-1989, 98 N.E.3d 292. The trial court, in the retrial, should consider the impact of the Supreme Court's decision if it is available by the time of trial.

19